Good morning, Your Honors. May it please the Court, my name is Elizabeth Poe, and I'm here representing the appellant, Baldev Singh, in this case. There are two issues here, and today I'd like to focus my comments on the smuggling charge. Baldev Singh is married to a U.S. citizen. They've been married for over five years. So if the Court agrees with us with respect to the smuggling charge, the Court would not need to reach Mr. Singh's asylum claim. So we are asking the Court to reverse the immigration judge's decision that Mr. Singh violated the smuggling statute for three reasons. First, there is no finding in the immigration judge's decision to support the legal conclusion that Mr. Singh actually violated the statute. Second, the immigration judge's negative credibility findings with regard to the smuggling claim do not withstand scrutiny under Ninth Circuit standards. And third, the only two pieces of direct – there are only two pieces of direct evidence in the record that would support a finding that Mr. Singh had any involvement whatsoever in the plan to smuggle Baljinder Corp. into the United States. And both of these pieces of evidence are highly unreliable and would be insufficient to sustain his finding by clear and convincing – Maybe? Right. One of those pieces of evidence is the confession which Officer Olson prepared at the time of the arrest. And as we've noted in the briefs, we believe that this confession should have been suppressed because the confession was obtained in violation of the agency's own regulation when Officer Olson both – Well, that may be true, but why is it not – you said it's unreliable. What's unreliable about a confession? Pardon me? Okay. I mean, that may or may not be the case, but I heard you say it's unreliable. Right. And I think it's unreliable for a couple of reasons. First, if you look at the actual confession itself, it's found at AR 825, the method by which it was obtained calls into question its reliability. You'll see that Officer Olson wrote the questions on that statement himself. He typed those in. And then instead of allowing Baldev Singh to fill in the answers, Officer Olson actually hand-wrote in the answers to make it look as though Baldev Singh had actually reviewed the questions and answered them himself. And Officer Olson testified that, in fact, it was he who wrote the answers. And I think also if you look at the substance of what is in that statement, that also calls into question its reliability. For example, the statement says that Baldev Singh had met Baljinder Kaur for the first time in Toronto, when in fact there's unrebutted testimony in the record that Baldev Singh and Baljinder Kaur are first cousins and that they'd known each other since childhood. So I think it's evident when you look at that statement that Officer Olson basically took the statements that the real smuggler, Kalarai, had supposedly made at the time of the arrest when he pointed the finger at Baldev Singh and then translated those into a statement and had Baldev Singh sign it. So even on top of the fact that this was seen in violation of the regulation, it also in itself is highly- I mean, that's certainly a reading of it, if you will. But what do you do about the fact that this is a situation where you've got two people pointing the finger at each other, saying he, the smuggler, was a dupe. I mean, this happens all the time. This is what criminals do. They're pointing the finger at each other. Usually they're both involved, but it's highly convenient to say that. Yeah, and I think that- But isn't that why we have trial judges to figure these things out? Right, and I think that- In this case, a trial judge believed the Kalarai family and disbelieved your clients. Well, in this case, the immigration judge said that he chose to believe the testimony of the officers. And it's important to note that Kalarai never testified at the hearing. The immigration judge was relying solely on the hearsay testimony about what Kalarai supposedly told Officer Olson. You don't even have hearsay. And although hearsay is admissible in immigration proceedings, this Court considered a very similar piece of hearsay testimony in a very similar case, and that case is Hernandez-Guadarrama v. Ashcroft. And in that case, the alien, one of the aliens who had been smuggled into the United States provided a written statement at the time of the arrest. And the written statement implicated Hernandez in the plan to smuggle them across the border. Now, the Court in that case concluded that that statement was insufficient to support the judge's findings for two reasons. The first reason was that the government had made the witness unavailable for cross-examination by deporting her to Mexico. And the second reason, the Court noted that that witness had an interest, a personal interest, in providing the testimony that she did because she herself was subject to felony prosecution for having entered the United States illegally after being deported. That was an immigration case or a criminal case? That was a Ninth Circuit case, an immigration case decided by this Court last year. And I think those same two factors are present when we consider the hearsay testimony of Officer Olson about what Kalarai told him. And in this case, I think it's even worse because the government did not even bother to obtain a written statement from Kalarai like the government did in the Hernandez case. It's simply the oral hearsay testimony. And after Officer Olson had spoken with Kalarai, the government escorted them back to Canada and released them with no strings attached. So I think it's clear that the government took affirmative action to make that witness unavailable for cross-examination. What are the circumstances under which your client signed the confession? Well, the circumstances, the testimony is inconsistent on this issue. The officers testified that our client had had the questions read to him and then answered the questions. I know. But I'm asking about after the officer did what was admittedly done, and that is the officer makes out the questions and answers somewhat a la Carnac, the what are the circumstances, what's the justification for disavowing the statement that he has signed? Well, Baldev Singh testified that he was threatened by Officer Olson, that he needed to sign the statement. He was threatened with physical violence. And the officers offered a different story as to the circumstances under which the statement was signed. But our position is that Mr. Singh was coerced into signing that statement. Did I.J. accept his characterization that he was threatened? The immigration judge chose to discredit Baldev Singh's testimony. And we have raised in our briefs reasons why we think that the immigration judge's negative credibility findings are not sufficient. The immigration judge essentially made four credibility findings with respect to the smuggling charge. The first was that Mr. Singh's testimony was inconsistent or hazy, but the judge didn't point to any specific instances where his testimony was inconsistent or evasive. The second was that Baldev Singh could not correctly remember the color of the uniforms that the officers were wearing. And I think that clearly is a trivial inconsistency of that and doesn't go to the heart of the issue. The third was that the immigration judge reasoned that the officers' testimony was consistent with the written record, and therefore the officers should be believed over Baldev Singh. And I think that's clearly not logical in this case because it was the officers who created the entire written record. So the fact that their testimony is consistent with their own written record would not be a reason to discredit Baldev Singh's testimony. And I realize I only have less than two minutes left, and if it's okay with the Court, I would like to reserve that for rebuttal. Okay. Voted. Thank you. May it please the Court, counsel. My name is Helen Bruner. I'm an assistant United States attorney for the Western District of Washington here to represent the respondent, Alberto Gonzalez. Let me just go straight to the alien smuggling charge and address some of the arguments presented by counsel here this morning. There is nothing inherently unreliable about the statement that was taken from Mr. Singh in this case. The process that counsel, excuse me, points to of writing out questions and then asking them of the individual and then handwriting in the response that the individual gives is nothing more than occurs in a number of cases. The way in which someone is the questioner and doesn't write out a report like responses to the person's own questions, that's not unusual around here? Well, Your Honor, with due respect, I've seen it before. Perhaps I would prefer a long narrative written report. And, in fact, if the Court looks in the record, I believe at 860 is one example. There is actually a narrative report that's written afterwards. I think that perhaps the officer could at best be described as giving himself a script of what questions he wanted to ask. But be that as it may, that is the process that he testified to doing. And in and of itself, there's nothing inherently unreliable about that. Let me point out, however, for another reason why you can accept the fact that Mr. Singh took, in fact, made that statement. If you look at the record, Mr. Singh at one point, both in his affidavit that he submits to the Court prior to the hearing, and I will give the Court the cite to that in a minute. It is — well, I'll — before I finish my argument, I will give that to the Court. But in any event, his affidavit, he redresses one of the questions that is asked of him, and that question relates to what his intention was to assist Baljinder Kaur in finding a husband when she was in the United States. In the written report, he is asked whether or not he intended to marry her. In his testimony and in the affidavit, he said, well, the officer misunderstood me. I meant that we were going to seek a husband for her in the United States. So my point there, Your Honors, is that even he does not deny that he's made a statement, even though earlier in his testimony he says he didn't make a statement, and later he tries to explain that statement. In any event, Your Honors, I would suggest that the evidence here, even leaving aside his statement, shows by clear, unequivocal, and convincing evidence that he did, in fact, engage in aiding and abetting the smuggling of Ms. Kaur into the United States. First of all, he lives in Detroit. He travels to India just shortly before these events. He returns after almost a four-month absence. On the 4th of April, goes to Toronto. On the 10th of April, where he's photographed with her, hugging her, and the record obviously has different views of what that means, but the photographs are there for the Court to look at. He then leaves seven days later and drives to the West Coast. He tells, and this is also in the record, the inspector, when he's coming into the United States at the Blaine Port of Entry, he tells the inspector that, in fact, he had driven across Canada and had been in Canada for a week and a half, when his car was supposed to be in the United States and stopped at Rapid City, South Dakota. He then, we then get to the events of April 22nd, the day that he's crossing into the United States, and if the Court looks at the record, and I believe Administrative Record 860, he crosses at 6.15 p.m., the car with the two individuals the four individuals, the two gentlemen, the child, and Ms. Cower, crosses at 8.22 p.m. He then returns to Canada and comes through about 30 minutes later. It's quite a coincidence that they're only seven minutes apart, and then he meets her in Bellingham, having said that he didn't know where he was going to meet her until she called the brother in Michigan, and he then put her in touch with him. That all seems an incredibly implausible story, and the conclusion that I think... And what about the suitcase and the women with women's clothes? Yes, Your Honor. How did that play into it? Well, I believe that the record establishes the following, that the officer at Lane finds in the car, in the trunk of the car, a large suitcase with women's clothing. Okay, I'm sorry. Let me make my question more specific. He went across the border a couple of times. That's correct. Back and forth. And was he inspected at any of the prior crossings, and was there a suitcase there? Do we know anything about that? Or was the suitcase found on this last crossing where he was arrested? The suitcase is actually found, Your Honor, on the first crossing at 6.15 p.m., seven minutes before she comes across in the car with the three other individuals. He is crossing south? He is crossing south from Canada into the United States. So he must have crossed north at some point before that. And there's nothing in the record to indicate where and when that crossing occurred? Sure. He travels across on the United States side, on Interstate 90, and at some unknown point in time crosses into Canada and then crosses back in the United States at 6.15. That's correct. And that's when they find the suitcase? That's when they find the suitcase. And she crosses over when? Seven minutes later at 6.22 p.m. And how do we know that? It's in the record at 8.60. All three of the agents report the time because they are doing surveillance,  they find the suitcase. And what does the suitcase contain again? There are actually two separate suitcases. There's a suitcase in the trunk that contains women's clothing and, according to the officer at secondary, the photographs of Mr. Singh and the woman in the CN Tower in Toronto. All in the suitcase with the women's clothes has the photographs as well? That's correct. Now, Mr. Singh, of course, says he testifies that, no, the photographs were actually in the suitcase that was on the back seat, but that also included the women's makeup. I just point that out because there is some dispute. And his explanation for the women's clothes and the women's ID is that this belonged to somebody else? The explanation for the women's clothing is that he was driving his brother's car, that his brother and sister-in-law had been on a vacation shortly prior, that they had, when they returned to their home, they simply left the large suitcase in the trunk of the car and forgot it before they gave him the car to drive from Michigan to Seattle to pick up Mr. Singh. And that would be inconsistent if you believe the testimony that the photographs were in that suitcase? If one believes the photographs were there? That's correct, Your Honor. I'm just going to get the facts right here. That's correct. Anyway, they let him go and then followed him to Bellingham? That's correct, Your Honor. I've never heard of that. I thought once you were clear on the border, you're hold free. I mean, I hadn't cared, but I was hurt. They followed him to the Exxon station and then to Bellingham? They followed him to the Exxon station, although, Your Honor, with due respect, being from this district, I do know and have handled a number of cases where there is surveillance that then follows from the border. No, it's good to know that our government is careful about it. Did they follow him back into Canada on the Circle? They followed him until he went into Canada, and then when he returned back in, reestablished the surveillance. I do want to make sure that I didn't – How far is Bellingham from the border? Oh, it would be, depending on which border crossing, approximately 20 minutes, so 25, 30 miles. And his story is he went to the Exxon station because he got a call on the cell phone or something? His story, to make sure that I'm correct here, is that he was contacted by the woman and ultimately given directions as to which – where to meet her off this particular exit in Bellingham. And his story is that he was – Well, the woman called the brother. The woman called the brother was given the cell phone number and called. And called him. Yes. That's my understanding. I did want to clarify one thing so that I do not leave the Court with a misimpression. I said we do not know where and when he actually crossed from the United States into Canada, and that is correct. But he testifies that he went from the United States into Canada on the 20th of April, so two days before his return into the United States. So I did want to make sure that I didn't leave the Court with a false impression. Yeah, I think you answered the question, which I, in fact, asked, is there any documentation as to – there was no inspection to document when he actually crossed the border. But thank you. Thank you, Your Honor. You have some time left for rebuttal. Thank you, Your Honors. It sounds pretty suspicious. Seven minutes apart, and then he drives 20 miles. Yes, I think – It's not a gas station. It sounds to me like they were caravaning. Well, there is a lot of circumstantial evidence in the record. That's the best kind of evidence. And there's a lot of – Eyewitnesses lie. They forget. They misperceive. But, boy, that's circumstantial evidence. But the key point here – I've got to get around. The key point here, though, is that the immigration judge never made any findings with respect to what inferences could be drawn from that circumstantial evidence. So I think what the government is trying to do here is to ask this Court to make new findings of fact that were never made by the immigration judge below. The question is whether or not the record supports the immigration judge's findings. And if the record supports the findings, the particular way he got there isn't all that significant, is it? Well, that's the correct legal standard. But in this case, if you review the immigration judge's decisions, there really are no findings of fact. The immigration judge just merely concludes that he doesn't believe Baldessi's testimony, and therefore he's guilty of violating the smuggling statute. The immigration judge's decision does not contain any finding of fact that shows what act it was – There's a story about the phone call to the brother, and then he gave the cell number, and then they – she calls him, and they happen to meet 20 miles south of the border after having crossed the border within seven minutes of each other. Sounds like a big whopper, doesn't it? Well, that doesn't take into account the unrebutted testimony of the two witnesses, Baldessi's brother, Bola, and also Baljinder Kaur. And both of these witnesses testified that Baldessi had nothing to do with any plan to bring Baljinder into the United States. How do they cross the border within seven minutes of each other? Well, I think – And then meet up with him, you know, a short time later, 20 miles south of the border. How does that coincidence happen? Well, there was a plan, and the testimony is consistent on this point, for Baldessi to meet Baljinder in Washington and drive her back to Michigan. So we're not denying that there was any coordination whatsoever. We're just pointing out that all of this planning occurred on the U.S. side of the border. And merely transporting a person within the United States after they've been smuggled into the United States does not constitute smuggling. In the seven-minute crossing, which could not have been planned this side of the border because it had not been coordinated while they were both north of the border, is just a big coincidence. Well, you could look at it another way, too. The fact that he crossed the border two times, why would he go through the border twice and draw undue attention to himself if he was knowingly involved in some kind of smuggling operation? So I think there's two ways you can look at that piece of evidence. And if there are two ways, we go with the I.J.'s, right? Well, the I.J. did not make a conclusion. He did not make a finding of fact on that issue. Okay. Thank you. Cases are listed and submitted. Thank you. We'll next hear from
judges: Goodwin, Kozinski, Shadur